# Commercial Bank of Selma v. Crenshaw.

108 497
f123 258

*Statutory Action of Detinue to recover a Note and Mortgage.*

1. *Note and mortgage construed together as one instrument.*—In ascertaining the meaning and determining the effect to be given the provisions of a note and mortgage executed to secure its payment, said note and mortgage having been assigned together, the two instruments must be construed as one instrument; and having been transferred, the transferee will be holden to a knowledge of every stipulation in the mortgage affecting or having reference to the note, to the same extent as if such stipulations had been embodied in the note itself.

2. *Same; negotiability of note as affected by provisions in mortgage.*—A promissory note for a certain amount was made payable October 15, 1890, to "H. C. Keeble Company at the Commercial Bank of Selma." Contemporaneously with the execution of this note the maker thereof, to secure its payment, executed a mortgage on personal property and all the crops grown by him during the current year. This mortgage contained, among others, the following stipulation: "The undersigned will deliver all the cotton grown, raised, received or controlled by him during said year to the H. C. Keeble Co., at the said city of Selma, as rapidly as the same can be prepared for market, the same to be sold by said corporation, as the agent and factor of the undersigned, at the usual commission of $1 per bale; and the net proceeds thereof shall be applied to the payment of the debts and liabilities herein secured; the same to be first applied, however, to any debts or liabilities of the undersigned arising out of the premises other than the debts evidenced by said note." *Held:* by BRICKELL, C. J., and McCLELLAN, J., that this stipulation in the mortgage did not destroy the negotiability of the note, and the assignment and transfer of said note for value and before maturity by the payee invested the

·32

transferee with a title thereto, freed from all equities and defenses existing between the original parties. By COLEMAN and HEAD, JJ., that such stipulation took the note without the influence of the law merchant, and the maker was entitled to notice of any transfer thereof, as in the case of other non-negotiable securities. (HARALSON, J., not sitting.)

3. *Detinue for note and mortgage; tender of amount due.*—Where in an action of detinue to recover a note and mortgage given to secure it, it is admitted by plaintiff there is a certain amount of the indebtedness still due, there can be no recovery, unless the plaintiff pays into court, at the institution of the suit the sum admitted to be due.

APPEAL from the City Court of Selma.

Tried before the Hon. J. W. MABRY, Special Judge.

This was a statutory action of detinue, brought by the appellee, Randall Crenshaw, against the Commercial Bank of Selma, to recover a certain note and mortgage. The facts of the case are sufficiently stated in the opinion.

The defendant reserved a separate exception to each of the following portions of the court's general charge to the jury: (1.) "It was the duty of the defendant, if it refused to accept said money tendered because it was insufficient in amount, to have given that as its reason for refusing to accept it." (2.) "It is not incumbent on the plaintiff to show that the note given by H. C. Keeble Company to defendant, mentioned in evidence, has been paid, unless you believe from the evidence that plaintiff had notice, as I have stated, of the transfer of plaintiff's note and mortgage to the bank." (3.) "The commercial character of the note sued for does not protect defendant against payments made thereon by Randall Crenshaw to H. C. Keeble Company, without notice of its transfer, though the note was transferred before maturity, for value in due course of trade." The defendant then requested the court to give to the jury the following written charge: (1.) "The court charges the jury that if they believe the. evidence in this case, they must find the issue in favor of the defendant." The court refused this charge, and the defendant duly excepted to the court's refusal to give said charge as asked.

There was judgment rendered for the plaintiff, and defendant appeals, and assigns as error the rulings of the court upon the pleadings, and the giving of the portions of the general charge to which exceptions were re-

[Commercial Bank of Selma v. Crenshaw.]

served, and the refusal to give the charge requested by the defendant.

DAWSON & PITTS, for appellants.—The Commercial Bank was a *bona fide* purchaser of the note sued on in the usual course of its business. This note is a negotiable instrument and is governed by the law merchant. Its sale and transfer by endorsement for valuable consideration and without notice, created in the bank a paramount right of action against the maker, discharged of all defects, equities and defenses to which it was subject before its acquisition by the bank.—Code of 1886, § 2684; *Cap. City Ins. Co. v. Quinn*, 73 Ala. 560; *Winston v. Westfeldt*, 22 Ala. 760; *Wildsmith v. Tracy*, 80 Ala. 261; *Johnson v. Hanover Bank*, 88 Ala. 274; *Bank v. Hall*, 6 Ala. 643.

After a negotiable note is pledged or endorsed to another, payment to the payee will not discharge the liability of the maker, and is no defense against the *bona fide* holder for value, who obtained it before maturity, although the maker had no notice of its transfer. The maker is not entitled to notice of the transfer of negotiable paper.—Tiedeman on Com. Paper, § 374; 2 Daniel on Neg., Instr., §§ 1227, 1230; 1 Randolph on Com. Paper, §§ 195, 199, 461, 465; *Wilcox v. Altman*, 64 Ga. 544; *Wheeler v. Guild*, 20 Pick. 545; *Davis v. Miller*, 14 Gratt. 9.

The note sued on being negotiable, and having been transferred for value before maturity, is not changed in its character by the mortgage given contemporaneously to secure its payment. The note and mortgage must be construed together.—*Minell v. Reed*, 26 Ala. 730; Tiedeman on Com. Paper, §§ 41, 42, 251, 301; Randolph on Com. Paper, § 197; Dan. on Neg. Instr., § 800. Unless the mortgage contains some stipulation which destroys its negotiability, the note still retains its commercial character, and unless it contains an object quite distinct from the payment of money, the character of the note is not discharged.—Randolph on Com. Paper, §§ 204, 208.

JEFFRIES & JEFFRIES, *contra.*—The court did not err in overruling the defendant's demurrer to plaintiff's replication number seven. The note and mortgage were part and parcel of the same instrument, and the defend-

[Commercial Bank of Selma v. Crenshaw.]

ant, by the terms of the mortgage, was put on notice.—
*Dobbins v. Parker*, 46 Iowa 357 ; *Polo Manfg. Co. v. Parr*,
8 Neb. 379; *Carpenter v. Longan*, 16 Wall. 271; *Hartley v.
Wilkinson*, 4 Camp. 127 ; *Leeds v. Lancashire*, 2 Camp.
205 ; *Cholmeley v. Darley*, 14 M. & W. 344; *Blake v. Cole-
man*, 22 Wis. 416; 2 Amer. & Eng. Encyc. of Law, 3 10,
D. 13.

The replication does not show that the balance due on
said mortgage and note was not paid into court long after
the commencement of this suit. It was not necessary to
pay the amount of the tender into court until the repli-
cation numbered seven was filed. "A plea of tender,"
the statute requires, "shall be accompanied with the
payment of the money to the clerk of the court."—*Frank
v. Pickens*, 69 Ala. 372 ; *Caldwell v. Smith*, 77 Ala. 157 ;
*Park v. Wiley*, 67 Ala. 312 ; Code of 1886, § 2685 ; 7
Waits Ac. & Def., 592.

The court did not err in its charge to the jury.—*Dob-
bins v. Parker*, 46 Iowa, 357; *Carpenter v. Longan*, 16 Wall.
271 ; *Polo Manfg. Co. v. Parr*, 8 Neb. 379 ; 2 Amer. & Eng.
Encyc. of Law, 340, D. 13.

McCLELLAN, J.—This is an action of detinue, prose-
cuted by Randall Crenshaw against the Commercial
Bank of Selma, for the recovery in specie of a certain
note and mortgage executed by said Crenshaw to the H.
C. Keeble Co., and by said company assigned and trans-
ferred to said bank for value before maturity. The note
was executed January 21st, 1890, for $150, and payable
October 15th, 1890, to "H. C. Keeble Company at the
Commercial Bank of Selma." The mortgage, cotem-
poraneously executed, covered certain live stock and
farming implements, a wagon &c., and all the crops
grown &c., by the said Crenshaw on the J. L. Crenshaw
place in Dallas county, Alabama, or on any other land
in said county or State, and was conditioned for the pay-
ment of said note and the other indebtedness thereafter
to be incurred for plantation supplies. The mortgage
contains also the following, among other stipulations :
"And the undersigned does hereby covenant and agree
to and with the said H. C. Keeble Co. as follows, namely :
*  *  *  *  *  *  *  *  *  *    2nd. That the under-
signed will deliver all the cotton grown, raised, received
or controlled by him during said year to the H. C. Keeble

[Commercial Bank of Selma v. Crenshaw.]

Co. at the said city of Selma as rapidly as the same can be prepared for market, the same to be sold by said corporation, as the agent and factor of the undersigned, at the usual commission of $1.00 per bale ; and the net proceeds thereof shall be applied to the payment of the debts and liabilities herein secured ; the same to be first applied, however, to any debts or liabilities of the undersigned arising out of the premises other than the debts evidenced by said note." Crenshaw, having no notice of the transfer of this note and mortgage to the Commercial Bank, delivered cotton to the Keeble Co. of sufficient value to pay all except about eighteen dollars of his indebtedness; the cotton was sold by the company, as his agent and factor, and the net proceeds of sale credited to him on its books, but no part of such proceeds was paid to the bank on, or otherwise applied to the payment of, said note, and the bank has never received any thing in that behalf. The Keeble Co. having failed, and plaintiff, then coming to a knowledge that his note and mortgage had been transferred, tendered the bank $18.44, as in payment of the balance conceived to be due from him on the note, and demanded that the papers be delivered to him. The tender and demand were refused, and he thereupon instituted this suit, and some days afterwards paid the sum of $18.44 into court. It is not controverted that the note and mortgage were at the same time assigned to the bank, nor that the papers were pinned together when delivered into the hands of the officials of the bank.

The important question presented for our consideration on this appeal manifestly is, as to the negotiability of the note executed by plaintiff to the Keeble Co., and assigned to the defendant. In determining this question the note and mortgage are to be construed and looked to as one instrument, and the bank must be holden on the facts we have stated to a knowledge of every stipulation in the mortgage—and, among the rest, that quoted above—affecting or having reference to the note to all intents and purposes as if such stipulation had been embodied in the note itself.—1 Rand. Com. Paper, § 197 ; 1 Dan. Neg. Instr., § 156 ; *Chambers v. Marks*, 93 Ala. 412.

Of course the mere fact that the note is secured by a mortgage exerts no influence upon the question of its commercial character. Leaving that circumstance out

of view, the case presented in this connection is this : Crenshaw promises in a writing signed by him to pay the Keeble Co. $150 on October 15, 1890, at the Commercial Bank of Selma. Here are all the elements of a promissory note—a written promise to pay a named person a sum certain on a stated date and at a bank therein designated.—Code, § 1756. In this promissory note is embodied, however, a stipulation, which is not essential either to its efficacy as a promise to pay or to its negotiability, to the effect that the promissor will deliver all cotton produced or controlled by him to the payee as rapidly as the same can be prepared for market, to be sold by the latter as the agent and factor of the former on the usual factor's commission, the net proceeds of such sales to be applied, by the agent or factor, of course, to the payment of the note. And the question recurs : Does this stipulation destroy the negotiability of the note, which without it is confessedly commercial paper in the hands of the bank, in the sense of not being affected by any equities that might obtain between the original parties thereto? And the answer to this inquiry depends upon whether the additional stipulation introduces any element of uncertainty in the sum to be paid, or the time of payment, or the place at which payment is to be made. Very clearly the absolute promise to pay the definite sum of one hundred and fifty dollars was in no wise affected by the superadded agreement as to the delivery and sale of cotton and application of the proceeds. It is most manifest that this specific sum was to be paid whether any cotton was delivered and sold or not. So far as the certainty of the amount is concerned, therefore, the special stipulation is entirely innocuous, and without effect upon the negotiability of the paper.

Is the requisite certainty as to the time of payment affected or eliminated from the contract by the additional stipulation? I think not. There is in truth and in fact but one stipulation entered into by the parties in this connection, and that is that payment should be made on the 15th day of October, 1890. This is the express provision of the note and there is, I undertake to say, nothing in the mortgage to the contrary. And the sum then to be paid was the amount of the note in full. There is no intimation, no stipulation in the note or in the mortgage from which it can be inferred, or which affords any

basis for an inference, that partial payments could, as a matter of right, be made at any time before October 15th, or that the holder of the note was under any duty to receive prior to that time anything short of full payment of it, or indeed that he was under any obligation to accept even full payment before the stipulated day. The stipulations in the mortgage that the payor is to deliver cotton to the Keeble Co., as factors and agents for sale on account of the payor on the usual commissions, and that the proceeds of such sales shall be applied to the payment of this note and other indebtedness of the payor, furnish no ground for a different conclusion. By the note, Crenshaw undertook and obligated himself absolutely to pay $150 to H. C. Keeble Co. on October 15th, 1890, at the Commercial Bank of Selma. The stipulations in the mortgage just stated were at most only an agreement that the proceeds of cotton delivered to Keeble Co. for sale on commission, and sold by the company as the payor's agent, should be applied to the payment of this note according to its terms, that is, to the payment of *$150 on October 15th, 1890, at the Commercial Bank of Selma.* But even if it be conceded that the stipulations of the mortgage with reference to the application of the proceeds of cotton had any effect upon the time of payment set down in express terms in the note—for which concession I can find no warrant in the contract the parties have entered into—the utmost operation they could possible have in the premises would be to invest the payor with the right to pay the amount before the day named, if the necessary funds should be sooner realized from the sales of cotton delivered by him to the Keeble Co. According this effect to the special agreement we have a contract to pay $150 on October 15th, with a right reserved in the payor to pay *that sum* before that time if the money necessary to that end, namely, $150, should arise or be acquired from a certain source. The authorities uniformly support the proposition that such a stipulation does not affect the commercial character of an otherwise negotiable instrument. Thus, in *Walker v. Woollen*, 54 Ind. 164, s. c. 23 Amer. Rep. 639, the promise was in these words : "Six months after date, or before, if made out of the sale of Drake's Horse Hay-Fork and Hay Carrier, I promise to pay James B. Drake or order," &c. &c.; and it was held that this was an absolute promise to pay

at a certain time, coupled with a conditional promise to pay sooner upon the happening meantime of a certain event, which might or might not happen, and that this stipulation for earlier payment in a certain contingency did not destroy the negotiability of the note. The court said : "Such conditional promise embodied in a note containing an absolute promise to pay at a time specified does not destroy the negotiable qualities of the paper, or take it out of the operation of the law merchant." The Supreme Court of Pennsylvania declared the same doctrine on a like stipulation, the promise being to pay twelve months after date, or before, if the amount of the note should be made out of the sale of a certain seeding machine.—*Ernst v. Steckman*, 74 Pa. St. 13, s. c. 15 Am. Rep. 542. And upon similar considerations, the law has come to be well settled that a note payable by its terms on *or before* a future day therein named, though the maker thereby is invested with the right to pay such a note at any time after its date, is yet, for all purposes of negotiation, to be regarded as payable solely on the day therein named.—*Jordan v. Tate*, 19 Ohio St. 586 ; *Mattison v. Marks*, 31 Mich. 421 ; Tiedeman Com. Paper, § 24. So, in *Charlton v. Reed*, 61 Iowa 166, s. c. 47 Am. Rep. 808, a note payable twelve months after date, or before, if the money is received from a certain source, was held to be negotiable. And to the same effect are the following cases and texts : *Capron v. Capron*, 44 Vt. 410 ; *Palmer v. Hummer*, 15 Am. Rep. 353; *Cota v. Buck*, 7 Met. 588 ; *Gardner v. Barger*, 4 Heisk. 669 ; *Cisne v. Chidester*, 85 Ill. 523 ; *McCarty v. Howell*, 24 Ill. 341 ; 1 Rand. Com. Paper, § 112 ; 1 Dan. Neg. Instr., §§ 43, 44, 45.

This right to pay the note before October 15th out of the proceeds of cotton, conceding its existence for argument, does not involve a right to make partial payments on the note any more than there would be a right to make partial payments before maturity on a note payable absolutely on a specified day. The special agreement, granting its effect to be that Crenshaw could pay the note prior to October 15th with proceeds of cotton, would operate to mature the note, in the sense of giving him the right to discharge it, when the necessary funds from this source were in hand to pay it in full.

Not only so, not only is the contract of the parties, evidenced by the note and mortgage, without any stipu-

lation, express or implied, for partial payments, the law being clear that without such stipulation no right exists to make partial payments, but there is an equal absence of stipulation, and all basis for inference of intention, that payment was to be made or might be made elsewhere than at the Commercial Bank of Selma. The promise in the note is to pay at that bank. There is nothing in the mortgage to the contrary. The instrument, indeed, itself recites that the note is payable at that place. If its further stipulations are to be taken to authorize payment before October 15th, which I deny, they are yet wholly barren of any stipulation, or the remotest intimation or implication, that there is any right existing in or duty resting upon Crenshaw to make payment at any other place whatever. Conceding his right to pay the note before October 15th, if the necessary funds should arise from the sales of cotton, that right was to make payment at the bank. On the concession mentioned, the note and mortgage were notice to all holders of the former with notice of the latter of Crenshaw's right to so pay at that place prior to October 15th, in the contingency named, and it was, therefore, upon such holder to receive payment there made when so made in full of the note. And neither Crenshaw nor his agent, Keeble Co., would have been under any necessity or obligation to run down such holder and make even full payment to him. In the very nature of things payment elsewhere would have been in the teeth of the plain terms of the contract, could have been made only by mutual consent whereby those terms were in effect modified; and if made before maturity, whether in full or partially, would have been at the risk of Crenshaw, affording him no protection against the note in the hands of a purchaser with notice only of the stipulations of the note or mortgage. Of course a holder of contracts to pay money, whether they be negotiable instruments or not, may accept payment at any time or place, but neither has he the right to demand, nor has the payor the right to make, payment except at the time and place stipulated. The question here is not as to the place any holder might accept payment, but as to the place at which any such holder had the right to expect and demand payment, the place of presentation for payment and for non-payment, at which the paper might be protested. This place in

this case was as certainly the Commercial Bank of Selma, under the language of the note with the mortgage stipulations, as by the terms of the note without these stipulations.

But it is insisted, that the rights and duties of the parties under these writings are to be determined by reference to the customs of the country in which the contract was made, common knowledge thereof and of the course of the seasons and habits of husbandry of the people. It is said that the court judicially knows that the cotton crop is harvested in the latitude of Perry county for the most part at least prior to October 15th; that the mortgage requires the delivery of cotton as rapidly as it can be gotten ready for market; and that, therefore, it must have been the intention of the parties that this note should be paid off in instalments as cotton was received, at uncertain times before that date. Conceding the facts thus assumed to be within common knowledge, shall such knowledge of the customs and habits of a country, the course of the seasons and the maturity of crops, the supposition that contracting parties meant this or that because this or that would best fit in with the habits of the people, be looked to or indulged against the words they have used to express their meaning? Shall we take what they say, the plain terms they have expressly agreed upon, or some vague and shadowy idea evolved out of their surroundings as to what they meant, to reach, fix and declare their intention? The law is too well settled and too obviously supported by every just consideration obtaining in the premises, to require discussion or citation of authority to the establishment beyond cavil of the proposition, that a plain and unambiguous contract can not be controlled, varied, modified, construed or interpreted by reference to the customs, habits or surroundings of the contracting parties, whether such customs, habits and surroundings be within the judicial knowledge of courts, or be brought to their knowledge through the mouths of witnesses. But if this contract were ambiguous, I deny that deductions from common knowledge lead to the conclusion insisted upon as to the intention of the parties. It is manifest from the mortgage that it was in contemplation of the parties that Crenshaw's whole crop of cotton would be about five bales. He binds himself to deliver only five bales.

He in fact did deliver only five bales. If it is common knowledge that the gathering of cotton commences some time before October 15th, it is also common knowlege that it is never completed in this latitude, rarely indeed half completed, prior to that time ; and it would, I think, be entirely safe to say that as a rule not one-half of a given crop is gathered, prepared for and put on the market as early as the middle of October. These parties recognized this. The mortgage contains no stipulation for the delivery of the cotton or any specific part of it by October 15th, but to the contrary, the mortgagee had until January 1st, to make the deliveries contracted for. Moreover, it is to be borne in mind, if we are to grovel in the labyrinths of judicial knowledge as to the seasons and customs of the country, that where cotton is delivered to a commission merchant or cotton factor for storage and sale for and on account of the producer, the delivery is not necessarily for immediate sale ; but the factor, in the absence of special instructions, has a discretion as to the time of sale. Indeed, one of the chief reasons for his existence and employment is that, having the cotton ready for sale and delivery at any time, and being always in the market, he may hold it, sometimes indeed for months, until an opportune moment, in the interest of his principal. It is also to be remembered that the secured debts were to be paid not *in cotton*, but in the *proceeds of cotton*, and the proceeds of the cotton first sold were to be applied to debts and liabilities of Crenshaw to Keeble Co. other than that evidenced by this note, which other debts, it is fair to presume the parties then contemplated, would amount to the sum actually incurred afterwards, which was something over one hundred dollars. How it can be inferred that parties intended that the whole of Crenshaw's crop would be gathered, prepared for market, delivered to Keeble Co., and sold prior to October 15th. surpasses my comprehension. How it can be concluded that it was their purpose to pay this note and the debt of one hundred dollars out of the proceeds of the sale of say two bales of the cotton, which was all they had any reason to expect would have been delivered prior to October 15th, I can not conceive. That they expected to pay any part of the note before October 15th, the other indebtedness having to be first paid out of the cotton first delivered

and sold, it is unreasonable to suppose. It is shown in this case that the total proceeds of Crenshaw's crop, the total proceeds of all the cotton he bound himself to deliver to Keeble Co., and of all the cotton he did deliver, were insufficient to pay this note after the application of a part of the proceeds to the other debt. To say, therefore, that it was the intention of the parties to pay off this note in instalments prior to October 15th out of the proceeds of cotton, when they had no reason to expect that any cotton would be received and sold before that time, the proceeds of which could be applied to this note, and when indeed the whole contemplated proceeds of cotton to be delivered up to January 1st were insufficient to pay off the other debt and the note, would be to arrive at an intention controlling and varying the express terms of a plain contract in a way and by a process and upon data, which not only furnish all the illustration needed of the wisdom of the law in forbidding ambiguous contracts to be thus emasculated, but which also demonstrate the incorrectness and unsoundness of the conclusion as to the intentions of the party insisted upon, considered wholly apart from the terms they have set down as expressing their objects and purposes.

But it is said the Keeble Co. was by the same instrument both the factor and creditor of Crenshaw, and entitled in the latter capacity to the net proceeds of sales of cotton as soon as realized. This is the assumption of the point in issue. That Keeble Co. was not the creditor of Crenshaw in respect of the amount evidenced by the note after that had been transferred to the Commercial Bank seems to me to be too clear for discussion. That company was paid its debt in consideration of the transfer of the note. Thereafter the company had no claim on this note against Crenshaw, but the latter owed the amount of it to the bank, and the bank, not Keeble Co. at all, was entitled to receive from Crenshaw, or from his agent, the net proceeds of the sale, not indeed as realized, but at the maturity of the note whether that was, as I think, absolutely on October 15th, or, as I have conceded for the discussion, at such prior day as should find a sufficiency of the proceeds of cotton applicable to this debt in the hands of Crenshaw or his agent, Keeble Co., to pay the note in full. The mortgage in

terms provides for and thus evidences that the parties
contemplated an assignment of it and the note secured
by it, and it would be anomalous to say that the assign-
ment, when made as thus contemplated, in which event
it is stipulated in effect that Crenshaw shall pay the se-
cured sums to the assignee, was not to and did not con-
stitute the relation of debtor and creditor between
him and the assignee. There are cases in which an as-
signment of the evidence of a debt does not deprive the
payee of the right to make payment to the promisee,
or rather more accurately, there are evidences of debt
which can not be assigned at all so as to impose an obli-
gation on the promissor to pay the assignee. Thus a
paper, otherwise negotiable, but containing an express
condition that it should be given up to the maker as
soon as the amount of it was received by the person to
whom the promise was made, was held to be non-nego-
tiable, the court saying: "The defendant by the terms
of the note had a right to pay it in full at any time be-
fore maturity to the persons to whom it was made pay-
able. Such payment to them would have been a good
discharge of the contract, although it had passed over to
a third person, if the promissor had no notice of
such transfer. The stipulation or condition, therefore,
was inconsistent with its unlimited negotiability, and
takes away from the contract the essential feature of a
promissory note.—Chitty on Bills, 134 *et seq.*"—*Hub-
bard v. Mosely*, 11 Gray 170, s. c. 71 Am. Dec. 698. And
partly on the same principle, it is ruled that a written
promise to pay A. B. a sum due to C. D. unless paid to
C. D. by a day certain, and if paid to the latter the
writing to be surrendered to the maker, is not commer-
cial paper.—*Chapman v. Wight*, 79 Me. 595. But neither
of these is the case at bar. Here there is no stipulation
that the note is to be surrendered to Crenshaw when he
shall pay the amount of it to Keeble Co. To the con-
trary, as we have seen, Crenshaw expressly undertook
to pay any assignee of Keeble Co. Moreover, he exe-
cuted a note having in itself all the requisites of com-
mercial paper. He expressly agreed to pay a sum cer-
tain at a certain time and bank. Had the intention
been that he was to pay only to Keeble Co., there would
have been no sense in undertaking to pay at the bank.
That provision is consonant only with a purpose to pay

the note at that bank to the holder of it at maturity, whether the holder should be Keeble Co. or not. There is absolutely nothing in the special stipulations in the mortgage supposed to bear on this matter, which are at all inconsistent with this view, or afford any ground, in my opinion, for holding that any right was reserved by Crenshaw to pay to Keeble Co., regardless of the fact that the latter no longer held the paper.

I am unable to interpret the special stipulation otherwise than as creating the relation of principal and agent or factor between Crenshaw, on the one hand, and the Keeble Co., on the other, both in respect of the cotton to be, and which was, delivered and in respect of the net proceeds of the sales thereof. By the express terms of the agreement the Keeble Co. was to receive and sell the cotton as Crenshaw's agent and factor, and not as his creditor. The sales being made as agent and factor, the proceeds necessarily came to the hands of the company, and were held by it, not in its own right as creditor, for in respect of this note it had long ceased to be Crenshaw's creditor, but in the right of Crenshaw and as his agent. Taking the matter at this point, we have money in the hands of the Keeble Co. held for and as the agent of Crenshaw. Then follows the agreement between the parties—between Crenshaw, the principal, and the Keeble Co., the agent—as to the disposition the agent shall make of the money to the effect that it shall be applied—by the agent necessarily and obviously, since the company no longer sustains any other relation to Crenshaw so far as the note is concerned, and in that capacity—to the debts secured by mortgage, first the advances, and afterwards the debt evidenced by the note. The delivery of the cotton was not a payment; it was delivered for the purposes of sale and was to be sold at the usual commission of one dollar per bale. The receipt of the net proceeds of sale by the agent was not intended to be and was not a payment. After such receipt the contract required that the proceeds should be applied to the debts, and such application alone constituted payment. The act of applying the proceeds to the debts, of payment thereof on the debts, was essentially the act of Crenshaw, whether intended to be performed and performed by his own hand or by the hand of the company; and this is equally true, and mani-

festly so, whether the debts were still due the company, or had been assigned to third parties. And, moreover, this act of application of proceeds, this duty resting on the company to pay the note out of the proceeds, could be as well performed, it was as appropriate to the agency, as much incumbent on an agent to perform it, by payment to any holder of the paper, the same having been assigned, as it would have been right and proper for the company, as agent, to credit such proceeds on the note, if it had continued to be the holder of it. This then, so far from being a reservation of the right to pay the Keeble Co. in any event, and thereby be entitled to a surrender of the note, whether then held by that company or not, was in reality a renewed assurance of payment to any holder of the note; and the special stipulalation, thus importing only that the net proceeds of cotton should be applied by Crenshaw through his agent, the company, to the payment of the note at maturity did not, in my opinion, destroy the negotiability of the note. The bank took it with notice only of Crenshaw's right to apply the cotton money to its satisfaction, and of the duty which the Keeble Co. was under to Crenshaw to so apply the same as his agent but it was no concern of the bank whether Crenshaw's agent was faithful to its trust or not, and of no consequence to it whether the company applied the cotton proceeds as it had agreed to do, other than would have been the case had there been no agency at all, and Crenshaw had stipulated for the application by his own hands of the net proceeds of the cotton to the note, in which case, obviously, Crenshaw's failure to so apply such proceeds would in no wise have affected his absolute obligation to pay one hundred and fifty dollars to the holder of the paper on October 15th, 1890. Crenshaw should have seen to it that his agent performed the agency. That the agent was unfaithful is his misfortune, the cause of which lies with him rather than the bank. The latter having his unconditional promise to pay, with notice only of a right and duty on his part to pay out of the special fund, but to pay at all events out of some fund, was under no obligation to notify him that it held the paper. To the contrary, in view of the fact that he had set his hand to and issued a note which was in form negotiable, it had a right to assume that he, knowing that the note was payable on a certain day at

the Commercial Bank of Selma, would have funds there on that day to meet it.

This conclusion gains support when the futility or inutility of notice to Crenshaw is considered. The mortgage recites in the paragraph next succeeding that we have quoted, "that the H. C. Keeble Co. is engaged in the business of selling cotton on commission; and the main purpose of the above advances is to promote that business by securing the sale of cotton." The stipulation for the delivery of cotton to the company was in promotion of this commission business. Crenshaw had contracted to deliver cotton in consideration of advances, and to pay the company the usual commission of one dollar a bale for selling it. He had received the advances in consideration of which he had thus obligated himself. There is no intimation of a condition in this contract to the effect that it should not hold in the event the note in question was assigned. The fact that the note was assigned to the bank could not possibly have relieved him from the obligation to deliver the cotton to the company, nor have taken away the company's right to sell it, receive the proceeds and charge for its services in that behalf. Of what avail, therefore, would notice of the transfer have been to him? None whatever that we can conceive of. With or without such notice he had no choice but to deliver the cotton as he did do, and with or without notice to him of the transfer, the company had precisely the same right to sell the cotton and receive the proceeds. A notice which involves no legal consequences can not be a notice which the law requires. Confessedly, if after notice of transfer he had delivered the cotton to the company and allowed it to receive the proceeds of sale, he would be liable to the bank for the face of the note. The whole case was tried below on the assumption of the correctness of that proposition. Then how can the absence of such notice protect him from liability, when had it been given him, he would still have rested under precisely the same duty and obligation as without it to deliver cotton to the company for sale and receipt of proceeds by it? Manifestly, I think, no right or obligation of Crenshaw involved in this case depended on his knowledge of the transfer of the note to the Commercial Bank, and he is liable now on that note just as he would be had he been fully advised of its transfer from the moment it was made.

My own conclusion, therefore, is that the fact that Keeble Co. received the proceeds of Crenshaw's cotton, which the latter intended to go in payment *pro tanto* of this note, is no defense against the bank's claim of the full amount of the note against Crenshaw, and of consequence the latter had no right to recover the note and mortgage in this action, not having paid or tendered the full amount to the bank. I believe this conclusion is not only that which alone is justified on the law and facts of the case, but that the contrary view will lead to the most disastrous consequences in the destruction of the negotiable quality of almost every promissory note the payment of which is secured by a mortgage. The court, however, is equally divided on the question, Chief Justice BRICKELL concurring in the foregoing opinion, and COLEMAN and HEAD, JJ. taking a different view as shown in the opinion of HEAD, J.

The only other matter necessary to be considered arises on the sufficiency of the plaintiff's replication (No. 7) to defendant's 4th plea. The complaint claims "one mortgage and note executed by Randall Crenshaw [the plaintiff] to H. C. Keeble Company for the sum of one hundred and fifty dollars, and, due on, towit, October 15th, 1890, and dated January 22d, 1890; said mortgage being on one bay mule, one two horse wagon and two cows with the value of the hire thereof," &c., &c., without more. Defendant's 4th plea alleged, *inter alia*, the purchase of said note for value before maturity by it, that the same was commercial paper being payable at a bank, and that said note has not been paid to the defendant. To this was replied facts which, according to the opinion of my associates, rendered the note non-negotiable, and further that the plaintiff prior to notice of transfer to defendant had paid. to the H. C. Keeble Co. one hundred, thirty-one and 56-100 dollars of the amount evidenced by the note, and "that plaintiff, as soon as informed of the transfer and delivery of the note and mortgage to the defendant and before the commencement of this suit, tendered the defendant in legal tender of the United States eighteen and 44-100 dollars, which sum the plaintiff has paid the clerk of this honorable court, which sum together with the amount paid H. C. Keeble Co. is the amount of said mortgage." This replication was filed June 12, 1891, a considerable time after

the institution of the suit. Defendant demurred to this replication on the ground—among others—that it appeared thereby that the money alleged to have been tendered was not paid into court at the time of complaint filed, but was so paid when the replication was interposed, a date long subsequent to the institution of the suit. The court overruled this demurrer; and in so doing erred to the manifest prejudice of the defendant. The replication confesses that the plaintiff, conceding all he claims in other respects, owed the defendant a balance of $18.44 on the note and mortgage. Clearly until this sum was paid, or efficaciously tendered, the plaintiff could not demand the surrender of the note and mortgage, the evidence of his obligation to pay and the security for the enforcement of that obligation. The tender was made and refused. This entitles plaintiff to sue for the recovery of the papers provided he kept the tender good, so that at any time the defendant, upon surrendering the papers, could take what was confessedly due it upon them. The only way in which the tender could have been kept good on and after the institution of suit was by the payment of the amount tendered to the clerk of the court at the time of filing the complaint. This was not done. The plaintiff, therefore, had no title to the property he seeks to recover when the suit was instituted. The title, on plaintiff's own showing, was then in the defendant, and could not be divested for any purpose of this action by the subsequent attempt to make the tender good.—*Frank v. Pickens*, 69 Ala. 369; *Nelson v. Loder*, 132 N. Y. 288; Jones Chat. Mortgages, § 636; 2 Jones Mortgages, § 893; Pingrey on Chattel Mortgages, §§ 948 *et seq.* and 1135.

The judgment of the city court must therefore be reversed. The cause is remanded.

Reversed and remanded.

HARALSON, J., not sitting.

HEAD, J.—I concur in the opinion of Justice McCLELLAN that the judgment of the city court should be reversed on account of the failure of the plaintiff to pay into court, at the institution of the suit, the sum admitted to be owing on the note and mortgage sued for; but, upon due investigation and study, I am impelled to a

different conclusion upon the question of the negotia-
bility of the note, as affected by the terms of the mort-
gage given to secure it, in the hands of one who acquired
the note from the payee, with notice of those terms. We
are agreed that the two papers—the note and the mort-
gage—in the hands of appellant, who purchased both
from the payee, at the same time, must be read together
as one, and the question for decision determined upon
the agreement of the parties evidenced thereby.

It is a cardinal rule that in enforcing a written agree-
ment the court will seek to ascertain and give effect to
the intention of the contracting parties. That intention
will be gathered from the terms of the agreement itself,
and, when necessary, a consideration of the situation
and circumstances of the contracting parties, known to
them at the time the agreement was entered into, and
to the party claiming under them, at the time his rights
accrued. What then was the intention of the parties,
to the present contract, fairly deduced from the two in-
struments read together as one? It is maintained in the
opinion of my brother McClellan, that this contract con-
tains the four statutory requisites of a commercial paper,
good against all equities and defenses existing between
the original parties, in the hands of a *bona fide* purchaser
for value without notice, viz., a promise in writing to
pay, (1), a certain person ; (2), a certain sum of money ;
(3), at a certain time ; and, (4), at a certain designated
place of payment ; and that neither of these requisites
or elements is, in any wise, affected or impaired by any
other stipulation of the contract. I do not controvert
the proposition as to the first and second elements stated ;
but, as to the third and fourth, I maintain that the in-
tention of the parties, fairly deduced from the agreement
itself, was, that the note might be paid, before maturity,
in uncertain partial payments, at uncertain times, to be
determined and made certain by deliveries and sales of
cotton to, and by, the Keeble Co., which the promissor,
Crenshaw, obligated himself to deliver as rapidly as the
same could be prepared for market ; hence, that the note
would not be put in circulation, but would be retained
by the Keeble Co. whereby the maker was entitled to
notice of any transfer thereof, as in case of other non-
negotiable securities. The mortgage shows that the
Keeble Co., the payee of the note, was a cotton factor

and grocer in Selma, Ala.; that appellee, Crenshaw, was a farmer, engaged in growing cotton, in an adjoining county, and that the consideration of the note was for advances to enable him to make a crop that year, 1890. The other special stipulations important to be considered are as follows: 1. Inasmuch as the crops conveyed had not been planted, (January 21st, 1890,) it was provided that Crenshaw should, as soon as the crops were planted, execute to the Keeble Co. a supplemental conveyance as the said company may require, "so as to invest in said corporation the complete legal title to said crops." 2. "That the undersigned will deliver all the cotton grown, raised, received or controlled by him during said year to the said H. C. Keeble Co., at the said city of Selma, as rapidly as the same can be prepared for market, the same to be sold by said corporation, as agent and factor of the undersigned, at the usual commission of one dollar per bale; and the net proceeds thereof shall be applied to the payment of the debts and liabilities herein secured; the same to be first applied, however, to any debts or liabilities of the undersigned arising out of the premises other than the debt evidenced by said note." 3. "That the H. C. Keeble Co. is engaged in the business of selling cotton on commission, and the purpose of the above advances is to promote that business by securing the sale of cotton." And the mortgagor warrants that he will ship five bales of cotton by the first of January next thereafter, or pay one dollar for each bale not shipped. 4. "That if the undersigned fail to execute said supplemental conveyance, when required, or to deliver said cotton as stipulated, or to pay and discharge said debt and liabilities as the same accrue and mature, or to keep and perform any covenant or agreement herein contained, or make any default in the premises, then, in either or any such event, the said H. C. Keeble Co., its agents and assigns, are hereby authorized and empowered to enter upon and take possession," &c.; following with full authority to take and sell the property and crops and apply the proceeds to the payment of expenses and secured liabilities.

Crenshaw delivered to the Keeble Co., in the fall, five bales of cotton without notice that the note and mortgage had been transferred.

I think it can not be questioned that, under this agree-

ment, the Keeble Co. had the right to demand of Crenshaw delivery of all the cotton grown, raised, received or controlled by him during that year, *as rapidly as the same could be prepared for market*, without regard to the fixed maturity of the note ; that Crenshaw had the legal right so to deliver it, and that the parties were, respectively, invested with legal remedies to enforce these rights. Such, it seems to me, are the plain terms of the contract, expressed without doubt or ambiguity. In this connection, we know as common knowledge, and the contracting parties will be presumed to have known, that a large proportion of the crops of cotton is, according to the growth of the product, and the customs of agriculture, gathered and prepared for market before the 15th of October'; and that such crops are so prepared, in bales, in instalments, as the same may be gathered in sufficient quantities running through the harvest season. That they are so prepared in instalments, is contemplated by the very terms of the stipulation, that the cotton shall be delivered *as rapidly* as the same can be prepared for market. The stipulation, we observe, also, manifestly implies the duty and obligation on the part of Crenshaw, so to prepare the same, as rapidly as practicable. Whenever, therefore, a material part of Crenshaw's crop was made ready for market, he exercising diligence in preparing it as rapidly as practicable, it became his right and duty to deliver it, and the right of the Keeble Company to demand its delivery, although the 15th of October, the specified maturity of the note, had not then arrived. Let us suppose then, one or more bales were delivered at different times, we will say, in the month of September, as, under contract, might lawfully have been done. Just here the question, out of which the main contention grows, arises : What were the relative rights and duties of the parties in reference to the cotton so delivered? It is insisted in support of the negotiability of the note, that under the contract, these deliveries were made to the Keeble Co., as the *agent and factor* of Crenshaw ; that the cotton should be sold by the Keeble Co., as such agent and factor, and the proceeds held by it, as such agent and factor, until the maturity of the note, and be then applied to its payment or held, at least, until sufficient cotton should be delivered and sold to raise the full amount of the note, and then

applied to its payment.   It is contended that such is the meaning of the stipulation: "the same to be sold by said corporation, as agent and factor of the undersigned, at the usual commission of one dollar per bale, and the net proceeds thereof shall be applied to the payment of the debts and liabilities herein secured."

On the contrary, I maintain that the rights secured by the contract to the Keeble Co. to demand, and to Crenshaw to deliver, grow out of, and have reference to, the *mortgage security* of which the cotton is the subject; and that the stipulation that the cotton shall be sold and the proceeds applied to the payment of the secured debts means that it shall be sold, as delivered, and the proceeds at once so applied.   The issue is thus squarely presented. Unless one or the other of these propositions, viz., that the Keeble Company was to hold the proceeds until the maturity of the note and then apply them; or until a sufficient sum accumulated, and then apply them, is successfully maintained, I will undertake to demonstrate that the note cannot be regarded as commercial paper. It will not be supposed that the parties intended by the special stipulation, under consideration, authorizing the company to sell as a factor, to ignore the right and title of the Keeble Co., under the mortgage, to the cotton delivered to it, and its unquestionable right to have it made available for the payment of the secured indebtedness; and contemplated that only the relation of principal and agent existed between the parties, in respect of the cotton delivered and its proceeds, prior to the maturity of the note, whereby the dominion and control of the cotton and its proceeds, in the hands of the company, were retained by Crenshaw, just as would appertain to any other principal, in reference to property in the hands of his factor; hence, the proposition is, that the intention was that the proceeds should be held by the Keeble Company as Crenshaw's agent, until the maturity of the note, at the latter's risk; and yet, by virtue of the interest the company had in them as mortgagee, free from any power on the part of Crenshaw to direct or control the manner or means of their deposit or safe-keeping.   In other words, the parties agreed that the cotton should be prepared for market as rapidly as it could be done, and delivered as rapidly as prepared, and then sold, and the proceeds ap- ·

plied to the payment of the secured debts—but, nevertheless, the intention was that the proceeds should not then be so applied, but should lie idle in the hands of the company, as Crenshaw's factor, kept according to its judgment and discretion, free from the control of Crenshaw, but at his risk of loss, until the maturity of the note, or until a sufficient sum accumulated to pay the note in full. I am persuaded such a conclusion not only does not comport with common experience, but that it is opposed to the plain terms of the agreement itself. It cannot be denied that the right of the Keeble Co. to demand and compel the delivery of the cotton as rapidly as it was prepared for market, and of Crenshaw to make the deliveries, were alone by virtue of the security which the mortgage afforded, and not by reason of any relation of principal and factor created between the parties. It could not be contended that if, on the 15th of October, Crenshaw then having the cotton in his possession, had paid the mortgage debt with money, the Keeble Co. could thereafter maintain an action against him for the recovery of the cotton, for the obvious reason that its right to it was only for the security of the debt. The cotton, therefore, when delivered necessarily went into its possession *as mortgagee*. It was its stipulated duty to sell and apply the proceeds to the payment of the mortgage debt. I cannot avoid the conclusion, universally applicable as between mortgagor and mortgagee, in such cases, that the law, *eo instanti* upon a sale, applied the proceeds to the secured debt. The provision that the cotton should be sold by the company, as agent and factor of Crenshaw, at the usual commission, is no more in legal effect, so far as it affects the question now under discussion, than a power of sale in any other mortgage. All such powers are but the creation of agencies coupled with interests, and the univeral rule is that they must be strictly pursued. The law recognizes the same relation of trust and confidence between a mortgagor and a mortgagee invested with a power of sale, as obtains between other principals and agents, and holds the mortgagee to strict observance of good faith towards the mortgagor, and rigid conformity to the powers conferred. A stipulation that the mortgagee shall sell as agent of the mortgagor is no more than the law would have implied without it. The superadded relation of *factor*, in

the present case, manifestly had no other purpose than to entitle the mortgagee to charge the commission of a factor for making the sales, which, without the provision, probably it could not have done.

If I am correct in this conclusion, it follows, unavoidably, that the contract, in question, was not governed by the commercial law, touching the rights of *bona fide* purchasers without notice. In that event, a fair statement of its terms would be : A promise by the maker to pay a certain person, a certain sum, at a certain time and place, but subject to the binding stipulation that the maker might discharge the same, in whole or in part, before maturity, by making thereon partial payments, at uncertain times and in uncertain sums, to be rendered certain by the deliveries and sales of cotton, as the same could be prepared for market.

Upon the postulate that the note was intended by the parties to be and remain what, on its face it purported to be—a negotiable promissory note governed by the commercial law—let us notice the practical operation of the contract, if effect be given (as it must as against appellant) to the qualifying stipulation, above mentioned. The note, then, was given to perform the office of money to be used and to pass as money in the business of the country, for such is the nature of commercial paper. The Keeble Co., by the endorsement of its name thereon, could put it in circulation, and, in that condition, it would pass from hand to hand and place to place, through as many successive holders and places as the exigencies of commerce, in respect to it, might demand. The indorser, the Keeble Co., who put it in circulation, was under no duty or interest, and possessed of no power, to keep track of it, so as to locate, at any given time, the place or person where or by whom it might be held. It could never return to charge or affect that company, until after maturity, and formal notice to it of dishonor by the maker. The obligation of the maker, Crenshaw, was that he would be ready at the stipulated place of payment, on the day of maturity, to pay the note upon its due presentation there, by the then holder and owner thereof; or have funds provided, at that time and place, for its payment, on presentation. Meanwhile, it did not concern him by whom or where the note was held. Unless by some accident

of business or intercourse, he did not know, and could not know, where the paper was, or who the holder thereof, at any given time. The holder would take the paper with the absolute right to demand and receive payment, at the time and place appointed, freed from all infirmities and defenses which might impair it as between the original parties. He was under no duty or interest, meanwhile, to notify the maker, or any indorser, of his acquisition. Indeed, the paper put afloat by the payee, would flow like a bank note, through the channels of commerce, to unknown places, and into unknown hands, until at last, the final holder brings it back to the place of payment, on the day of payment, and visits its obligations upon the parties bound. The maker, when called upon for payment at maturity, was entitled to production of the note, that he might know the demand was made by the veritable owner. These are elementary principles of the commercial law. The law books, recognizing that the party primarily bound on commercial paper can not know its holder until presentation at maturity, inform us of limited defenses which accrue to him when sued without previous presentation and opportunity to pay; and we are not wanting in authorities which hold, that an action will not lie at all against the acceptor of a bill or maker of a negotiable note, when no opportunity has been given to pay by due presentment, according to law.—Chitty on Bills, Marg. p. 353, and cases cited in note. Other cases hold that it dispenses with the necessity of tender before suit, and that tender, in such case, may be made for the first time by bringing the money into court.—Chitty on Bills, *supra*. Our own decisions recognize qualified defenses in such cases.—*Irvine v. Withers*, 1 Stew. 234; *Evans v. Gordon*, 8 Port. 152; *Montgomery v. Elliott*, 6 Ala. 701; *Connerly v. P. & M. Ins. Co.*, 66 Ala. 432.

Applying the special qualifying stipulation, as I interpret it, and the logic of the argument in support of the commercial character of the note, must force its advocate to the position, that when the Keeble Co. received and sold a bale of cotton, the company (or Crenshaw, seeing to it, as he must have had the right to do, that his agent was faithful) must have set forth upon the world of commerce, and through its unknown labyrinths, traced and located the holder of the note and there ef-

fected the partial payment. And let us suppose the task performed and the holder found, and what results? The holder has purchased for value without notice, and is under no obligation whatever to receive the offered payment, and he relies and stands upon his right to demand payment of the whole when the paper matures. But let us suppose the payment accepted, clearly there was no right in the debtor, making partial payment, to demand a surrender of the paper, and no right or power to require or compel the indorsement of the payment thereon, hence the result, that, though partially paid, the note still stands as a circulating, commercial paper, ready to be transferred the next moment to an innocent holder for value, to return upon the maker at maturity with the resistless demand of full payment. Thus, we see, obviously, that the two principles, viz., that the note should be a circulating medium under the commercial law, and that the maker was entitled to make partial payments, in the manner I have attempted to show, will not adjust themselves to each other. They are utterly inconsistent.

"A note or bill must be free from contingencies or conditions that would embarrass it in its course."—Chitty on Bills, Marg. p. 134, note. As I have endeavored to show, this note must be read, as against appellant, as if it contained, on its face, the special stipulation, in question, authorizing the maker to make undefined, uncertain partial payments before maturity, the times and amounts to be determined by the sales of cotton, as aforesaid. Let us then suppose the stipulation to be incorporated in it, and it is perfectly apparent that it would represent to the person to whom offered, in commercial dealing, no certain sum whatever which could be collected upon it at maturity. It could not pass from hand to hand and be accepted as a paper which, at maturity, would represent and entitle the then holder absolutely to a certain sum of money freed from all payments, discounts or defenses, for the reason that, on its face, it shows the maker reserved the right to make partial payments, before maturity, and it could be known, at no time after the cotton season began, what payments may have been made thereon. It cannot be doubted that such a stipulation would destroy the commercial character of a note, otherwise negotiable.

I do not deny that the negotiable quality of a paper

having a fixed day of payment, with the other requisites, is not destroyed by the incorporation therein of a contingency, upon which the sum thereof may become payable sooner. Such was the nature of the case of *Walker v. Woollen*, 54 Ind. 164, (23 Amer. Rep. 639), and other cases cited by my brother McCLELLAN. In that case the note was: "Six months after date, or before, if made out of the sale of Drake's Horse Hay-Fork and Hay-Carrier, I promise to pay James B. Drake or order," &c. There the contingent promise was to pay the *whole sum*, on the given contingency, just as the absolute promise was to pay the whole sum at the fixed time; and it was properly held that the mere superadded promise to pay sooner, upon a contingency, did not affect the negotiable quality of the paper, since, by the absolute promise, it must at all events be certainly paid at a certain appointed time. Whether paid upon the happening of the contingency, or at the time specially fixed, the result would be the same. The whole contract would, in either event, be discharged and the note withdrawn from circulation and surrendered to the maker. But, suppose, instead of the contingent promise therein made, the note had stipulated that whenever the maker should sell a Hay Fork and Carrier, he should have the right to pay upon the note the amount realized upon the sale, and the creditor should have the right to demand payment thereof; we see, at a glance that the analogy between that case and the present is complete. Most clearly such a stipulation would have been inconsistent with the uses and purposes of a circulating paper. At no period in its history could it be known to any person to whom it might be offered in commercial dealing, how much was unpaid upon it, and taking it charged with knowledge of the maker's right to make partial payments, at indefinite times and in indefinite amounts, save only as the time and amounts would be made definite by the sales of machines, the purchaser would, in law, be charged with notice of all such payments as may have been made to any previous holder. Such paper lacks the most vital attributes of a circulating medium. It could not be trusted anywhere as representing any particular sum of money, for no one could know what it would bring, if anything, when presented for payment on the day of maturity. Such, in my judgment, is substantially the nature of Crenshaw's contract.

Nor do I deny that valid commercial paper may be payable in instalments; but it is well settled that, in order to render it negotiable, the amount and time of payment of each instalment must be certainly expressed in the writing.—Teideman on Com. Paper, § 25 d. note 4. No inconvenience can result from such a paper. When a given instalment matures, the paper, as to that instalment, ceases to be negotiable, and the maker, paying the instalment at maturity, will be protected against any subsequent holder. And the instalment, as in case of a note payable in gross, must be presented by the holder for payment, at the proper time and place.

The view I have taken that the parties intended the securities to remain in the hands of the Keeble Co. and be paid as I have indicated, is strongly fortified by the emphatic provision that the purpose of making the advances was to promote its business as a cotton factor, and that the cotton conveyed by the mortgage should be sold by it, as factor, at the usual commission of $1.00 per bale. It can not, of course, be disputed that it was not the intention of the parties that the note should be transferred without the mortgage, for the reason that it was legally impossible to do so, and preserve the integrity of both instruments. The mortgage was inseparable from the debt, and a transfer of the debt necessarily carried the mortgage with it, in equity. Nor can it be denied that if the debt had been transferred and notice thereof given to Crenshaw, the debtor and mortgagor, he would have been bound to deliver the cotton to the transferee. By no sort of construction of the contract could a conclusion be tolerated that he was bound to deliver the cotton to the Keeble Co., knowing that it had divested itself of all right, title and interest therein, and invested them in another. Thus, we see, upon the mere statement of the case, a transfer of the debt, under circumstances binding Crenshaw to a knowledge of it, necessarily destroyed the possibility of carrying into effect the controlling purpose with which the contract was made, to-wit, that the Keeble Co. should have the sale of the cotton as a factor, and earn the usual commission for that service. Considering that all parties intended to act in good faith; that the person entitled thereto, when the time should come for action, should enjoy the benefits of the security the mortgage afforded, how was

[Behrman & Winter v. Newton.]

it possible for the Keeble Co. to carry out its prime purpose of earning commissions as a cotton factor, if it was not intended and expected that it should retain the possession and ownership of the securities, which would give it the right to the possession and sale of the cotton?

It is very clear that the provision that the mortgage should stand as security for any additional advances which might be made, and which, if made, should be first paid, exerts no influence upon the case, as it comes before us. There was no obligation on the part of the Keeble Co. to make aditional advances. There was no debt, when the contract was entered into, except the note. It was but a precautionary provision to the effect that if, in the future, a further indebtedness should arise the mortgage should stand as security for the same. Such an indebtedness might or might not have arisen. It is immaterial, as far as concerns the question we have in hand, that it so turned out that it did arise.